Thank you, Your Honor. May it please the Court. Ryan Bangard on behalf of the Appellants, Missouri Ethics Commission, Director Klar, and Commissioners. This case presents two questions. A very broad question as to a facial constitutional challenge to the pack-to-pack contribution ban that was implemented in Amendment 2 by 70% of Missouri voters. The second question is a more narrow as applied challenge to that statute as it applies only to the ban applied to packs that contribute only to, that make only independent expenditures. Your Honor, this first question, at the facial challenge, is the one that I intend to spend most of my time on today. And that challenge, Your Honor, we believe is foreclosed and answered by the Eleventh Circuit in the Alabama Democratic Conference v. Attorney General case. It wouldn't be foreclosed, but you can argue whether it's persuasive. Yes, Your Honor. And, Your Honor, our position is that it would open a circuit split. If this Court were to rule against us on the facial constitutional challenge, it would open a circuit split with respect to the Eleventh Circuit's decision in the Alabama Democratic Conference case. Your Honor, this question is governed by exacting scrutiny. And exacting scrutiny, there's no dispute amongst the various parties that exacting scrutiny is the appropriate mode of analysis. And under exacting scrutiny, the challenge to the pack-to-pack contribution ban stands if the ban is closely drawn to serve a sufficiently important state interest. Your Honor, this ban meets that challenge on all fours. First, there is a very sufficient and adequate state interest at play here. In fact, multiple state interests. Precedent is clear that it is sufficient to uphold a ban on contributions. In this case, this is a contribution ban, not a ban on independent expenditures. A state interest is sufficient to uphold a contribution ban when that ban is designed to prohibit and address the risk of quid pro quo corruption. And there's no question here, Your Honor, that this ban is exactly designed to do that. Quid pro quo corruption is a concern that the Missouri voters had in mind when they passed Amendment 2. Certainly, Your Honor. So, quid pro quo corruption arises primarily in the context of contributions made to candidate committees, to candidates. The very concept of quid pro quo corruption is that a donor will give money to a candidate, and as a result of that, the candidate will feel indebted to the donor, will feel obligated to the donor. That's the very essence of quid pro quo corruption. That's the issue that was addressed in Buckley v. Vallejo. From that, the state has additional adjacent interests that are very important and that may also support limitations on contributions, such as the contribution limitation we have here. Why doesn't it alleviate quid pro quo corruption in the sense that it dilutes the influence? You don't know who actually made the contribution. So why does it do exactly the opposite of what you're saying? Your Honor, this is because this interest that we're addressing here today is not pure quid pro quo corruption per se, but the circumvention of contribution bans. And that is something that the Supreme Court has repeatedly said is a valid state interest. And here, Your Honor, is our argument on that point. Pack-to-pack contributions are a very unique animal in the campaign finance space because a pack can contribute, can make both independent expenditures as well as contributions to candidate committees. It's that second type of contribution, a contribution to a candidate committee that gives rise to the interest in preventing quid pro quo corruption. But the more packs that the money goes through, the less able you are to trace it to a particular donor. So wouldn't that decrease the amount of influence the donor would have on any particular candidate or committee? Your Honor, that's certainly an argument that the FLEs have raised. And, Your Honor, there are certain problems with that that I'd like to address. First, as you extend the range of packs, as you extend the chain of packs, or if you have a constellation of packs that hover around a central pack, there are various ways you can do this. Donors are not simply limited to giving money to a single pack that then gives to a candidate. The pack can give to an additional pack, which can give to an additional pack. Your point is that that can dilute the influence, Your Honor. But if those packs are under common control, if those packs are somehow coordinated together, then that would not dilute the influence. Moreover, it would allow circumvention of base limitations. What do you mean if they're coordinated? What's the hypothetical you're worried about? What do you mean if they're coordinated and working together? Certainly, Your Honor. Let me give you a hypothetical. Let's say that there is a wealthy donor who would like to give more money to candidates in a Missouri state election than is allowed by the base limitation. So he wants to give more than the limit. That's right. So how does he do it with these packs, in your view? He can contribute to a pack. He can form a pack and contribute unlimited funds to that pack. There's no limitation on the amount of money he can give to a pack. He's the only donor to the pack, in your hypothetical? He can be, or he can have other donors giving money as well. Well, I know he can. I'm trying to understand what you're worried about. If you have 100 donors, then McCutcheon says that reduces your interest. So I'm trying to understand if you're just saying making the same argument that was rejected in McCutcheon, or whether you've got a different hypothetical in mind. No, Your Honor. We're not making the same argument in McCutcheon. This is a very different factual situation. Let's say you have a single donor. Let's take that hypothetical. A single donor who gives money to a pack that that donor has formed, and either that donor controls directly, or that donor's associates control. That pack can then give money to other packs, a grouping of packs around it, that are also under the control of that donor, or his or her associates. That constellation of packs can then pass money to candidates. All that money is coming from that single donor. All that money is coming from that single individual. So you're hypothesizing a single donor who gives a pack number 1, and he also sets up packs number 2 through 10? Is that the idea? And then pack number 1 gives big amounts to packs 2 through 10, and then those packs give $2,600 to the candidate? That is certainly one very simple way that this can be done. And that is absolutely one of the concerns that the state has. Is that very real? Is there any record that that's ever happened, or that that's very realistic? Your Honor, there is certainly evidence in the record, when Amendment 2 was passed by the voters, that voters were concerned about the possibility of packs being used by wealthy donors to circumvent campaign finance limitations. So in that hypothetical, would that be so the concern is that expenditure or contribution limits would be exceeded, or that contributions, that any contribution limits would be exceeded. Certainly there's no interest in... Which would be illegal. I'm sorry, Your Honor? Which would be illegal, right? Correct. Under existing law. That is correct. And it's also against the law to attempt to circumvent contribution limits, right? Your Honor, the law definitely prohibits contributors from circumventing in various ways, but Your Honor, we do not believe that the pack-to-pack contribution ban is completely duplicative of those limitations. Certainly that's something that the FLEs have argued. This gets to the closely drawn issue in this case. Well, would your hypothetical be legal, but for the pack-to-pack ban? Your Honor, there are... If the money is earmarked, if the money is earmarked by the contributor, then that money must be reported back to the Missouri Ethics Commission. But if it's not earmarked, if it's simply given with a wink and a nod, then that kind of situation could be very difficult for the Missouri Ethics Commission to track down. To get back to Judge Colleton's hypothetical, couldn't a donor achieve the exact same thing by giving $2,600 to packs 1-10 or 1-20 or 1-50 and then have the money passed on to a candidate? It seems to me that there's a fit problem here as well, which is you don't actually solve the problem that you're trying to solve. Yes, Your Honor. The donor could achieve the same result that way, but it would be much more transparent and easier for the Missouri Ethics Commission to track down. And here's why. Because if the donor gives in his or her own name to 10 separate packs, and those packs then make a direct contribution to a candidate, those packs will be reporting back that the money came from the same donor. But here's the problem I'm having. For the same reason that you're citing a candidate is not going to be able to trace the money any easier or just as, you know, it's going to be just as hard for the donor to trace as it will be for the state. So the more you have pack-to-pack contributions, the less able the candidate is going to be able to trace it. For the same reason that the state won't be able to trace it either. And so I think there's an inconsistency there that I hope you can address. Certainly. I think what you're saying is if the donor doesn't realize that it is, if the candidate doesn't realize that it is donor A who is giving the money, then they won't feel as obligated to the donor. Correct. I mean, basically the pack-to-pack contributions shield the money from the donor just like it shields the money from the state. And so the more you argue that the state needs to be able to trace that money, you have the same problem with respect to the donor. In a completely antiseptic world, that may be the case. But in the hustle and bustle of politics, it's very often known who's giving the money. And that's the problem we're concerned about, is not the antiseptic hypothetical where the only way that a candidate may have knowledge of who's giving the money is by looking at MEC filings. But that's not the world that we live in. And the reality is that candidates know from whence the money comes. But the MEC and the public may not. It's not as transparent to them. And this gets at our transparency interest. Because transparency, although I know the appellees have argued it doesn't exist, is very much an adjacent interest to that of preventing quid pro quo corruption. Quid pro quo corruption can't be ferreted out unless regulators and the public have visibility into the chain of contributions that are being made. Is a bare transparency interest, is that sufficient to uphold the statute? And the reason why I ask that is you have the McIntyre case dealing with anonymous speech. And the court recognized the interest in being able to be anonymous  We're not arguing for a bare transparency interest. At the very most we're arguing that that is a supportive interest. But the primary interest is that of preventing circumvention. The primary interest is that of preventing circumvention of base limitations. And that is the concern. Transparency certainly supports the ability of the state to regulate in this area. Without transparency the state will not be able to determine whether or not circumvention has occurred. Certainly the appellees have argued that transparency is well served by some of the other limitations in Amendment 2. Such as reporting who is making the contributions to a PAC. Such as limitations on anonymous contributions or cash contributions. These are things that the appellees have argued. Our position, Your Honor, is that is not sufficient, nor is that capable of addressing the more sophisticated instances where a wealthy donor with means is able to create multiple PACs and have those PACs contribute amongst each other and to each other, ultimately with the money coming out the other end to the candidate. This entire process may be well visible to the candidate and understood by the candidate, but the public and the MEC does not have that same level of visibility. Therefore, transparency supports, the interest in transparency supports the state's true interest in anti-circumvention. Preventing circumvention of base limitations. So does the district court record contain an evidentiary record of these things that you're fearful of? Your Honor, the district court... I saw in the briefing there was reference to editorials and publicity about different things, but I'm interested in proof of that what you're concerned about is actually occurring. And if it is, how big a problem it is. Your Honor, two responses to that question. One, because we're operating under exacting scrutiny, the evidentiary burden is quite low here. In fact, if you look at the Shrink Missouri PAC case, the Supreme Court talked about the various ways that these interests can be proved up. Newspaper articles are certainly sufficient. Also, the mere fact that a large percentage of Missouri voters voted to approve Amendment 2 is evidence in and of itself that there was public concern. And if you look at the fact that Amendment 2, as it was advertised to the voters, dealt with anti-corruption, that is in the record. Also, newspaper articles addressing the concern of political leaders in the state of Missouri. And, Your Honor, I can give you a few record sites, if you would like. The fact that 70 percent of the voters approved Amendment 2 was found at Appendix 1219. There is an article that was written by Mr. Schnurbush. It was a law review article in 2015 that addressed the deep concerns about corruption that could arise from the fact that Missouri was effectively the Wild West. There were no real meaningful limitations on contributions before Amendment 2 was put in place. That's at Appendix 1288. There's a very deep concern about the use of dark money. But Amendment 2 covered a wide range. It wasn't just the PAC-to-PAC. That is absolutely correct, Your Honor. And on the PAC-to-PAC issue, there was a concern about dark money being used in connection with PACs. Dark money being money that can't be traced. Money that's not apparent. Money that is not transparent to the regulators or the public being used by wealthy donors to support candidates. That's at Appendix 1328. Also, the concern that donors would use PACs to obscure the source of funding. That's in an article at Appendix 1339. So, there are certainly newspaper articles, articles expressing public concern about the use of PACs to subvert and circumvent meaningful campaign finance limitations. And that is all in the record. When we, if I go to those articles and read those, it's going to talk about PAC-to-PAC contributions? Your Honor, it will talk about the use of PACs to subvert and circumvent campaign limitations. Now, the example that I gave earlier, the very detailed example, that is not in those articles. I will tell you that is not in those articles. But you can infer from the articles that that kind of construct is a concern. When you talk about dark money, that concept of dark money is and the concern that money can come from unidentified sources to support candidates is certainly something that the public is concerned about. And, Your Honor, I see that my time is up, but I'll end with this. In addition to a concern about circumvention, you also have the concern about the public's perception of corruption. And the Supreme Court has been very clear that a concern about public perception of corruption is something that the state absolutely may respond to with lawmaking. That is exactly what happened here. The public was deeply concerned, as evidenced by the record sites I have given, as well as other evidence in the record. The public had a deep concern about the use of dark money, about the use of PACs to circumvent campaign finance limitations. The public responded to that concern by passing amendment 2. And that is absolutely a sufficient and important state interest to which the law may respond. Very well. Thank you for your argument. Mr. Hatfield, we'll hear from you. Thank you, may it please the Court. I'd like to start where we ended, which is on the evidentiary record that Judge Shepard has raised. It is not, there is not a sufficient record here that PAC-to-PAC transfers give rise to corruption or even the appearance of corruption. The record evidence has to do with editorials and commentary that were speculation. This is not, and the Court can see them, I won't overcharacterize them, but this is not fact reporting. So-and-so gave money, so-and-so was indicted for giving money. This is not the type of evidence that we've seen in other cases, such as bans on riverboat gaming contributions, where you have evidence of indictments, you have evidence of actual corruption. There is no evidence. This is mere speculation, as was in shrink PAC. It's not our main argument, as the Court knows, but I wanted to make sure we made that clear. I went back over the weekend. I thought the Supreme Court upheld the law in shrink PAC. They did. In shrink PAC, they said no mere speculation, though. We've never relied on mere speculation. They have an affidavit from the sponsor of the bill about the factual issues that were occurring. They had fact reporting. They did rely on newspaper articles about transfer or excessive contributions that had been made in that case. Fact reporting, not just opinions. So in the Alabama case that the state talks about, if the Court goes and looks at that decision, Alabama Democratic Conference, that case was actually sent back once, and then the decision that the state relies on was the second time around. The first decision is reported at 541 Fed Appendix 931, and it says, the state presented ample evidence of possible corruption through PAC-to-PAC transfers. ADC and the Democratic Party made contributions to each other. Second, many members of the Executive Committee are also members of the PAC Committee. There was overlapping control of the two committees. Third, several candidates made contributions to the PAC on and around the dates when commensurate amounts were paid to the PAC. Why isn't it enough for Missouri to say, people in Missouri can read that opinion and see exactly how it's done, and we don't want them to be able to do that in Missouri, so we want to enact this prohibition? Why do they have to show that it's already happened? Why can't they show that there's an obvious risk of it happening, and we want to prevent it from happening before the fact? Well, I think shrink tells us that normally the state has to come forward with some evidence of its interest. They can't just say, maybe this will happen someday. And McCutcheon talks about that too. They showed it happened in Alabama. They did. They did. Why can't Missouri rely on that? Alabama's system is different. That's an important part of McCutcheon, by the way. Maybe this is a way to segue in. McCutcheon talks about that each of these cases, you have to look at the system, and you have to look at where we are in campaign finance regulation, what that particular scheme is. Remember, as the court knows, McCutcheon specifically overrules a portion of the Buckley case from 1970-something. And they say, times are different, things have changed, this is a different regulatory scheme. And that gets to this issue of fit, which I think was, from sitting over there, the most interesting part of the whole discussion. The state certainly has an interest in quid pro quo corruption, or the appearance of quid pro quo corruption. No doubt about that. The Supreme Court's been clear on this. This court has been clear on that. How do you regulate quid pro quo corruption? You regulate the handing of checks to candidates so that there's not an appearance or the actual giving of one thing in return for the contribution. The state talks about a donor who would have, I'm going to throw a number in here, a million dollars that he wants to distribute out to candidates, so he sends to different packs. You can do that through one-step illegal steering. All you need is one pack to agree. So there goes $2,600. Then a second pack agrees. There goes $2,600. Then a third pack agrees. What the state wants to prevent here is a pack-to-pack transfer. So I just want to take a minute and make sure we understand the hypothetical they're positing. The donor gives money to Pack A and says, will you please pass this through to Pack B? That's illegal, by the way, under Missouri law. Pack A agrees to do that. And they pass the money to Pack B. And they say to Pack B, would you please agree to pass this through to the candidate? That's also illegal. So as McCutcheon says, you have to assume that an independent actor is going to agree to take money that they could use however they see fit, accept the direction from the donor. You have to accept that the independent actor of the pack is going to agree to violate the law. I believe it's a crime in this statute. But not just that pack. The second pack as well. That's where the fit problem comes in. But what about the counter-argument by the state, which is there's a traceability problem? The state can't see that it's happening when you have a pack-to-pack contribution. Well, the state can see that it's happening because there are reporting requirements. So I've got to say on the transparency interest, Your Honor put it very precisely. There is no independent transparency interest. And I think McCutcheon makes that very clear. Transparency is derivative of the interest in quid pro quo corruption and the appearance of corruption. If the public can see these transfers, it reduces the likelihood of corruption. These contributions are all reported. They must be reported. But more importantly, if the state has a transparency concern, regulate the transparency concern. Don't just ban the pack-to-pack transfer. McCutcheon talks about all the different things you can do. Make a rule that you have to report contributions within a certain time. If you get a contribution from someone and it goes out the door to a candidate within a certain period of time, let's make that a special report. I don't know that it would make it any more transparent. Well, and the traceability problem, I think, is probably one of the state's most serious arguments. And it's really made worse by the fact that a donor could conceivably tell the candidate down the line, hey, I gave money to this pack. We put it through seven or eight different packs and it eventually reached you. But the state would never have any ability to know that. And what's your response to that? Well, a couple things. First of all, a donor might say that anyway, right? A candidate calls a donor and says, I need some money. And the donor says, well, I gave money to the Republican Party. Didn't you get it? So a donor might say that anyway. That doesn't necessarily mean that there was a violation of the law. And so, I'm sorry, on the tracing. Well, just that the donor can make clear to the candidate I've given the money. But the donor's not exactly going to go to the state and say, hey, we ran this money through multiple packs. In other words, the state's at a disadvantage there. But it begs the question of whether the donor did, I guess, is what I'm getting at. So the donor certainly might say that. The donor might imply that. A donor that, under the Missouri system, there is no limit on how much a donor can give to a pack. Missouri's chosen not to regulate that in this really loose sort of scheme they have. So if a donor gives, and Judge Calhoun, you raised this, under Missouri law, a donor could be the sole funder of a pack. I think it raises a circumstantial case that that's a pass-through contribution. But you could just put a million dollars in a pack and have that go out. The candidates would know. What do you think about this 11th Circuit opinion? Do you think we would create a conflict in the circuits by affirming here? I know you say in your brief, well, that was different because of the contribution limits. But is that really a material distinction? I think it is. First of all, I guess I want to reject the idea that a circuit split's necessarily a bad thing. If they're wrong. I didn't say it was. I was just asking whether we would create... No, you didn't. But the state's implication is you should defer to the Alabama case. I don't know that you should. Because I think there is a good argument that they got it wrong in light of McCutcheon. Well, that's what I'm asking. You think it's incorrect, and if so, why? Or if you think it's really different in a material way. Well, I'm going to start with it's really different in a material way. And I'm reading from page 1070 of that opinion now. The ADC, which was the packet issue there, the ADC can continue to make unlimited contributions. I know factually that's different, but why do you think that's... Well, again, it goes to fit, goes to what we refer to as the double prophylaxis, right? So under Alabama law, the PACs cannot contribute to each other, but a PAC can go out and contribute in one step as much as it wants. So under our hypothetical where a donor gives money to the PAC, the PAC can still make unlimited contributions to the candidate all day long. In Missouri, though, there is this prophylaxis, if you will, on quid pro quo corruption, which is the $2,600 limit from the PAC. You mean so it would require the donor to use more PACs in Missouri than in Alabama? Right. So if you really want to evade limits and all that sort of thing, you're going to have to go to a different... it's a different analysis. But more importantly, what's the speech? I might have sidetracked on your thinking there, Judge. What's the speech, right? In Alabama, the PAC can still make an expenditure in whatever amount it wants directly to a candidate. The PAC could give, the way I read this opinion, a million dollars to the governor. Under Missouri law, the state has already limited how much the PAC can give to the governor. They've already put some restrictions on that. They've already put a reporting restriction. They've already put a limitation restriction. So to the extent there is some sort of evasion interest, the state has certainly limited and addressed that evasion interest with these contribution limits. Do they really need another ban on the PAC-to-PAC transfer to address that interest? And I think that's really our issue with this case. I don't think... we are not asking this court to say that no state could ever come up with a PAC-to-PAC transfer ban that would fit. Oh, the other thing in Alabama, when you read the beginning of that case, the real restriction there is on PACs that give to multiple candidates contributing to other PACs that give to multiple candidates. And in the introduction of that case, they talk about exceptions to the PAC-to-PAC transfer ban. I will say it's not completely clear from the way the facts are described in that case as to what they mean by that, but there are situations in Alabama where one PAC can give to another PAC. That is clear in that case. So I think there are some differences there. I'm not sure that the 11th Circuit is right in the Alabama case, because when you read McCutcheon and you read the discussions of the evasion issues... I mean, McCutcheon is an evasion case. That's what it's about. When the state professes to regulate speech to prevent evasion of another regulation, what is the analysis? And I think McCutcheon says that because of the reduced risk of corruption, because of the independent actors that would have to all conspire together to violate the law, it is not a realistic interest. You add that to this case, where it's really a triple prophylaxis, as I said. The First Amendment does not allow the state to require suspenders when a belt will do. And in this particular case, Missouri's other limitations get the job done. Would it be more realistic if there was a record here that showed that one of the single prophylaxis rule wasn't being followed, and that in fact they needed a double prophylaxis to be able to catch the violators? It would. And there isn't that type of evidence in this particular case. I'm sorry to bounce back, but that's... What about the... Maybe you can just clarify for me. I think I read in the material that federal PACs, so-called federal PACs, are not covered under this? Correct. How does that play? Is that relevant at all? I'm not sure it's very relevant. I thought you made the point that somebody could accomplish the same thing by giving to a federal PAC, which could then give to a Missouri PAC. Well, and that's... Is that true? Sure. So they could give to a... That's a great point. So they could give to a federal PAC... That point was in your brief. I'm not taking credit for it. Well, I guess what... The reason I say I don't know that's very relevant, I think it gets subsumed in the bigger argument. The state appears to be regulating some sort of two-step evasion. When you could accomplish the same thing with one-step evasion. I guess that's what I'm trying to get at. But that's true. A federal PAC, that's a PAC-to-PAC transfer, but the Ethics Commission has taken the position, generally, that they don't regulate federal PACs and this doesn't apply to federal PACs. But could a person as easily... Would it be... Is it very realistic that giving to a federal PAC is going to allow you then to get money back into Missouri as efficiently as giving to Missouri PACs? Well... Because I thought your argument was, well, they could just do this in three other ways, and so that shows that this is ineffectual and somehow affects the fit analysis. But if the other examples are more far-fetched, then there's not as big a... Well, the examples are legion. I mean, there are varying degrees. That's right. It's a little harder to do with a federal PAC. Judge Shepard reminded me of something that I don't want to sit down without mentioning. The other reason that the Alabama case is different, and I'm reading again from page 1070, the ADC, the PAC, offered no evidence that it contributed to other PACs prior to the ban or that it seeks to now. I think that gets lost. But the Eleventh Circuit made that point. There was no evidence in that case that the plaintiff had contributed to PACs or that it sought to in the future. That there was a speech issue that they were challenging. In this case, there is that evidence. The District Court specifically discusses that evidence that my client in particular had contributed to specific PACs. Port PAC is the one that he talked about a lot in the decision. So that's the other way that the Eleventh Circuit opinion is different. There was a different regulatory scheme and a different factual record. I owe Mr. Grime the remainder of our time. Okay. Mr. Hatfield, thank you for your argument. Thank you. Mr. Grime, we'll hear from you. Eddie Grime for the Free and Fair Election Plaintiffs. I wanted to talk very briefly about independent expenditures and IE only PACs. I have really just two points to make. One is going to relate more to what you were just talking with the other attorneys about. And the other is a point that has to be raised because I think a point was made for the first time in a reply brief. I want to make sure that we don't go astray on that point. First of all, the state did not appeal its loss on FFEF's as-applied challenge. And I think that's an important point because if for any reason the court today decides that the PAC-to-PAC contribution ban does comport with the First Amendment which we don't agree with, it should only modify the District Court's injunction so that it reflects the court's decision in favor of FFEF on its as-applied challenge. Now, here's why I bring this up in its reply. So you say, why do the briefs go back and forth then about why the statute should be construed narrowly and so forth if they didn't appeal? Well, because if you look, it's sort of a long point, but what they have said is that the AG himself has asked for a modification of the injunction to not cover independent expenditure-only PACs. He's done that. But the reason for that is that the AG and the Missouri Ethics Commission claim that their own advisory opinions as a matter of construction find that when you give to an IE PAC it's not a contribution. So the way they litigated this question wasn't the way they litigated the other parts of Amendment 2 that clearly violated the Constitution. On this point, they tried to give themselves wiggle room for later challenges along the lines of the ADC case. So they said, one, Amendment 2, despite the text, doesn't cover this, and by the way, you guys who are litigating here, you're not proper litigants because you're not truly independent. But the court made three findings that, in fact, FFEF is independent. And so the appellate brief would have been the place to have said we dispute those findings. In fact, under the clear error standard, the court could not have found that. You've got to go back and remand it. Okay, but isn't the issue before us whether the statute does, in fact, cover you? Well, that's the first issue. And we think it does. Yeah, I know, but you said they didn't appeal. That's right. But you're saying that issue's not before us, whether the statute covers? We believe, now that they've raised that point only for the purpose of telling you what the new injunction should be if you deny the facial challenge. So that's why they've done it. And it was sort of a hint in the direction. Why don't you speak to that, then? Why do you think we should not construe the statute in a narrow way? You know, they invoke the avoidance canon and so forth to exclude contributions that everybody apparently thinks are protected by the Constitution. Sure. The definition is very clear that supporting a political committee that goes out and makes independent expenditures is a contribution. There's no question about that. The Ethics Commission says, well, we've got these other ethics opinions that don't relate to this issue, but somehow they establish this historical tradition that when you give to an IE-only committee, it's not a contribution. Well, the problem is, if that's true, then all the disclosure rules go out as well, because we're outside the campaign finance system. So you've got no disclosure rules for IE-only PACs. We think it can't make sense. I mean, Your Honor, I think we've covered this in the briefing I wanted to hit. You're saying if we agreed with them on the scope of the definition, then there would be no disclosure requirements for giving to those PACs? Right. Because they're not contributions anymore. So it can't work. I mean, they've tried as hard as they can to avoid a finding that that part of Amendment 2 is unconstitutional, which is why we're in this kind of twisted conundrum. And we're just simply telling the Court that if for any reason you don't go with the PAC-to-PAC finding and the facial finding, at the very least the judgment should affirm the as-applied when that FFEF has. But I wanted to make a few other very quick points on this about IE-only PACs. Think about some of the circumvention arguments that were given here about other things that could be done. What they've missed is the actual dark money argument. The dark money argument is not PAC-to-PAC contributions. It's that someone gives to a C-4 whose donors are not disclosed. They're only shown to the IRS. And then the C-4 gives to a PAC. That's the dark money issue. And that's not covered by a PAC-to-PAC transfer ban. So whatever the articles say about the amount of time, I'll just... You mean because a C-4 is not considered a PAC? No. They're a corporation that can give to a PAC. And so the entire dark money issue is a red herring. It's not what they're actually covering. Nobody believes PAC-to-PAC transfers are the dark money issue. These transfers are disclosed in campaign finance reporting, and the press and political consultants are checking the MEC website constantly to read the 48-hour $5,000 contribution reports. So it's a false argument. And frankly, if somebody really wants to show that they're involved in helping a candidate, you wouldn't route money through many different committees and then later tell them, hey, I gave to committee number one and they routed it through. You would give a million dollars to an IE-only PAC, which under Citizens United, the court says, does not raise a risk of corruption. And you can do that. So that's what donors will do. And if that's okay, surely we don't think it's more corrupt where there's a higher risk of corruption to give to one committee and then have it transferred all the way through in just a few thousand dollar increments. Well, it's an important point. Because a lot of PACs are tied to a certain constituency of people. And so let's say they can raise $5,000 or $10,000. Everyone's joined together. Well, that PAC turns around and realizes $10,000 doesn't buy us a single unit of TV time. And so they've got another friend over here who did raise the money. Well, they've got to be able to associate with them. It really helps the small donor people who don't have enough money to just give to an IE-only group by themselves and go out and have ads run. And so Freedom Fair Election, my client, wants to be able to pull from these other committees that don't have enough money by themselves to do something. It's an important associational right and we're completely gutting it in the interest of transparency or anti-circumvention when in fact there's other things they can control for that. So we're cutting right at the associational right, but we're not really solving for the problems they claim are out there. Thank you. Okay. Thank you, Mr. Grime. Mr. Bangert, we'll hear from you in rebuttal. Thank you, Your Honor. I'd like to start by addressing this issue of whether or not the Alabama Democratic Conference case is on all fours in this case. We believe it is, Your Honor. And we believe that a departure from the ruling in that case would open up a circuit split. And here's why. Because in Alabama, the law prohibits pack-to-pack transfers, pack-to-pack contributions, just like the law here does. Now, Mr. Hatfield raised one distinction that I want to address right now, and that is in Alabama you don't have the same kind of base contribution limit imposed on packs given to candidates. That is true, but it's not particularly material here. And here's why. Because as Your Honor pointed out, all you have to do is create more packs. You still have the circumvention problem. You just have to work a little bit harder to get at it. And, Your Honor, this is a very important point. The reality that circumvention can occur gives rise not only to the very real possibility of circumvention and corruption, but a public perception of corruption. And the Supreme Court has been very clear that combating a public perception of corruption is every bit a valid and important and sufficient governmental interest to impose regulations of this sort. In the Alabama case, the Alabama Democratic Conference was a pack that made both independent expenditures and contributions directly to candidate committees. So it made both. The court held, the 11th Circuit held, that you could, that the state could prohibit those kinds of pack-to-pack transfers to ADC. Why? Why is that? Because there was still a perception of corruption. There was still a perception that the ADC could steer money to candidates and then make independent expenditures on the side to support those same candidates. And there was no evidence in the record that the ADC had adequately separated out the decision-making process. Here, here, we don't have any evidence in the record that AMAC pack has imposed any kind of separation in its decision-making process. It could very easily absorb money from another pack and then steer that money to candidates as well as make independent expenditures. You have the same risk of corruption, the same risk of perception of corruption in this case that we have in the Alabama Democratic Conference case. Counselor, I wanted to ask you about last council's argument, which is whether the issues relating to the free election fund are actually before us. And whatever your answer to that question is, whether or not we actually have to answer the statutory interpretation question about what a contribution is. Yes, Your Honor. It's before the court in a very narrow way. We do not contest that a ban on contributions from one pack to another where the recipient pack makes only independent expenditures, which is clearly the case with FFEF. FFEF has limited itself on this record to being an independent expenditure only pack. We do not contest that if the ban were to extend to that factual situation as applied, it would be unconstitutional. Now, our argument is that it does not extend so far as a matter of statutory interpretation. And we have briefed that issue in our brief. We've raised it on appeal. As a matter of statutory interpretation, the ban does not extend to a ban that would be plainly unconstitutional. Is it sufficient that they feel or could be reasonably threatened with prosecution or with violating the law that they don't necessarily trust the advisory opinions from the Attorney General? They don't know whether they can go forward and so it could chill speech? Is that sufficient to raise the issue before us? Only if that belief and that chill was reasonable. And our argument is, Your Honor, that based on the interpretation of the MEC and the reading of the statute, it is not a reasonable belief. Now, the provision extends to ballot initiatives, right? Yes, Your Honor. So then how do we construe it to not apply to independent expenditures? Isn't there an inconsistency there? Wouldn't expenditures in support of a ballot initiative by definition be independent expenditures? They're not tied to a candidate. Certainly, Your Honor. That precise question was not raised on an as-applied basis in this case. But the Supreme Court has been clear that contributions to ballot initiative-only committees look and feel a lot like independent expenditures. And if that question were to be presented to the MEC, the MEC would need to answer that question. And, Your Honor, I won't speculate as to how my client would answer that question, but there is some authority. But you're telling us that we should say, as I understood the argument, that the statute does not apply to independent expenditures? Yes, Your Honor. The statute does not apply to contributions to somebody who's going to make independent expenditures? Correct, Your Honor. But then we'd be saying it doesn't apply to somebody who's going to make an expenditure about a ballot initiative, even though the plain language says that it covers ballot initiatives. That's the part I'm trying to understand. Right. Your Honor, the very narrow question about whether or not a ballot initiative committee or a ballot initiative committee that makes only contributions to those types of issues, whether that is an independent expenditure or is not before the Court right now, there was no party below who raised their hand and said, I am a ballot initiative-only committee. But if that is the case, I think there's certainly an argument to be made that those types of committees look and feel like independent expenditure-only committees. Okay. Well, thank you for your argument. Thank you, Your Honor.